UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

VIKAS GOEL AND RAINFOREST TRADING
LTD.,

                    Plaintiffs,

             -v-

AMERICAN DIGITAL UNIVERSITY, INC.,
INTERNATIONAL MARITIME UNIVERSITY,
LLC, TELEDATA MARINE SYSTEMS LLC,
TELEDATA SYSTEMS AND SERVICES, LLC,
BUNGE LIMITED, BUNGE S.A., GRAINS AND
INDUSTRIAL PRODUCTS PTE LTD., ANUSH
RAMCHANDRAN AND STATE BANK OF
INDIA

                 Defendants.

------------------------------------------------------------------- X

|  |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: August 26, 2015 |

14-cv-2053 (KBF)
14-cv-1895 (KBF)

CORRECTED[1]
OPINION & ORDER

KATHERINE B. FORREST, District Judge:

    On January 2, 2014, plaintiffs Vikas Goel and Rainforest Trading Ltd.
commenced this action against American Digital University, Inc. ("ADU"),
International Maritime University, LLC ("IMU"), Teledata Marine Systems, LLC
("Teledata Marine"), Teledata Systems and Services, LLC ("Teledata Services"),
Bunge Limited ("Bunge Ltd."), Bunge S.A., Grains and Industrial Products PTE
Ltd. ("GRIPT"), Anush Ramchandran and the State Bank of India ("SBI") in the
Supreme Court of the State of New York, Westchester County. (Notice of Removal,

---

[1] In the previous version of this Opinion, the Court declined supplemental jurisdiction over the state
law claims and dismissed those remaining claims without prejudice. (ECF No. 59.) The state law
claims are now instead remanded to the New York State Supreme Court, Westchester County.

ECF No. 1.)[2]  Plaintiffs allege that defendants carried out a racketeering scheme, in violation of 18 U.S.C. §§ 1962(a), 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), designed to mislead and defraud plaintiffs.  The Complaint also includes state law claims for aiding and abetting fraud, money had and received, and establishing liability to parent company Bunge Ltd. on the basis of piercing the corporate veil liability.

Pending before the Court are two motions to dismiss – one from Bunge Ltd., Bunge S.A., GRIPT (collectively, the "Bunge Defendants"), and one from SBI. (ECF No. 21, 25.)  The motions have been extensively briefed and are based on numerous grounds; however, the Court dismisses this action solely on the basis of statute of limitations as plaintiff's civil RICO claims are clearly time-barred.  The statute of limitations began running in late 2007 and expired in 2011, long before the filing of this Complaint.

For the reasons stated below, the Court GRANTS defendants' motions to dismiss.

I.     BACKGROUND

A.     The Parties

Plaintiff Vikas Goel was the founder, Chairman, Managing Director and 99.9% shareholder of eSys Technologies Pte Ltd. ("eSys"), a computer equipment

---

[2] In March 2014, defendants removed this action to the United States District Court for the Southern District of New York.  On August 19, 2014, Judge Karas consolidated what had been separate cases against SBI and against the Bunge defendants. (ECF No. 15.) On March 6, 2015, this action was reassigned to the undersigned.

distribution company. (Compl. ¶ 50.) Plaintiff Rainforest Trading, Ltd. ("Rainforest") is a corporation established as a holding company to facilitate payment by non-party Teledata Informatics, Ltd. ("Teledata India") for 51% of Goel's eSys shares. (Id. ¶¶ 51, 141.)

Defendants in this action can be separated into the following three groups: (1) Anush Ramachandran and his related entities; (2) the Bunge Defendants; and (3) the State Bank of India ("SBI").

Ramachandran was the Chief Executive Officer of Teledata India, a non-party to this suit who is presently in arbitration with plaintiffs in Singapore. (Id. ¶¶ 52, 59-61.) Ramachandran also allegedly owned and controlled ADU, IMU, Teledata Marine, and Teledata Services. (Id. ¶¶ 52, 104.) ADU purported to be an online university, and IMU was a division of ADU. (Id. ¶ 53.) However, both entities allegedly had a total of just three employees, their address was Ramachandran's home in Scarsdale, and there were no professors or students. (Id. ¶¶ 11, 53-54.) Plaintiff alleges that they were sham companies, used to illegally transfer funds as a part of the racketeering scheme. (Id. ¶¶ 53-54.) Teledata Marine and Teledata Services were also allegedly sham companies, purporting to sell software, used in the scheme to fraudulently inflate Teledata India's sales and revenue. (Id. ¶¶ 17, 20-21, 55-58.)

The Bunge Defendants include Bunge Ltd., Bunge S.A., and GRIPT. (Id. ¶¶ 62-67.) Bunge Ltd. is a publicly traded agribusiness company with headquarters in White Plains, NY. (Id.) Bunge S.A., headquartered in Geneva, Switzerland, and

GRIPT, headquartered in Singapore, are subsidiaries of Bunge Ltd. that purport to be agricultural products trading enterprises. (Id. ¶¶ 66-67.) Plaintiffs allege that Bunge Ltd. used those two subsidiaries to further the racketeering scheme. (Id. ¶ 64.)

SBI is a private commercial bank headquartered in India. (Id. at ¶ 68.) It has a branch in New York, which it allegedly used to transfer substantial sums of money in support of the racketeering scheme. (Id.)

B.   Bunge's "Sham Contracts"

Plaintiffs allege that the Bunge Defendants illegally loaned money to Teledata India, for the purposes of profiting from India's high interest rates. (Id. ¶¶ 2-3.) Plaintiffs claim that it was illegal for the Bunge Defendants to lend money to Indian companies because it was not an authorized lender under India's Foreign Exchange Management Act of 1999. (Id. ¶¶ 2-3, 84-85.)  In order to sidestep Indian law, Bunge Ltd. allegedly disguised its loans by using subsidiaries Bunge S.A. and GRIPT to enter into contracts for the purchase and sale of fictional goods with Teledata India. (Id. ¶¶ 4-5.) Bunge S.A. and GRIPT entered into more than twenty "sham contracts" with Teledata India over a two-year period, valued at an excess of $150 million. (Id.)  On their face, the purchase and sale contracts appeared to be genuine, detailing the purchase price, product to be sold, and delivery terms. (Id. ¶¶ 5, 91.) In these contracts, the Bunge Defendants agreed to buy a product from Teledata India, for which delivery would be due in one year. (Id.) The Bunge Defendants would then borrow funds from various investors to make "advance

4

payments," which were, in effect, loans. (<u>Id.</u> ¶ 9.) Despite over $150 million in such contracts, the Bunge Defendants allegedly never bought, took delivery of, or asked Teledata India to deliver a single product. (<u>Id.</u> ¶¶ 93-97.) Instead, Teledata India would repay the money with interest to the Bunge Defendants at the one-year delivery date. (<u>Id.</u> ¶ 5.)

The Bunge Defendants forwarded these "sham sales and purchase contracts" to banks, which would in turn issue "advance payment" guarantees, meaning the banks would compensate the Bunge Defendants for the money advanced if Teledata India failed to deliver the contracted-for goods. (<u>Id.</u> ¶¶ 6-8.) In the event that Teledata India failed to pay the Bunge Defendants back, the Bunge Defendants could fraudulently represent to the banks that Teledata India had failed to deliver the products and demand the guarantee of the advance payments. (<u>Id.</u> ¶¶ 152-68.) The bank guarantees made the loans essentially risk-free to the Bunge Defendants, allowing them to profit from the difference between the interest rates on the loans they borrowed from investors outside India and the repayments by Teledata India at the Indian interest rate, which was significantly higher. (<u>Id.</u> ¶ 2.)

Teledata India had to appear to be a profitable business to obtain the guarantees. (<u>Id.</u> ¶¶ 7, 16.) Thus, the false purchase and sale contracts allegedly served the additional purpose of allowing Teledata India to inflate its revenue to $238 million in their March 2007 annual report, $130 million of which reportedly came from the fictitious sales to Bunge S.A. (<u>Id.</u> ¶¶ 16, 98, 100.)

C.   ADU and IMU Aid Teledata India's Illicit Repayment of Loans

Indian currency regulations mandate that an authorized bank, which reports to the Reserve Bank of India ("RBI"), must approve the transfer of money out of India to repay loans. (Id. ¶ 10.) While money could not legally be transferred out of India to repay loans, money could be transferred out of India to pay for services rendered. (Id. ¶ 13.) Thus, in order to repay the loans, Ramachandran-controlled Teledata India allegedly evaded Indian currency restrictions by using false invoices to transfer in excess of $127 million during 2006 and 2007 to the New York bank accounts of Ramachandran-controlled AMU and IMU as supposed payment for imports and consulting charges. (Id. ¶¶ 12-13, 110.)

Ramachandran then allegedly transferred a portion of the funds out of ADU and IMU's New York bank accounts to GRIPT and Bunge S.A. in payment of the loans. (Id. ¶ 14.) ADU and IMU transferred more than $54 million from their accounts to Bunge, either directly or indirectly through other Ramachandran companies, in around 55 transfers between 2006 and 2007. (Id.) ADU and IDU transferred these funds, despite not buying any products or having a contractual relationship with GRIPT or Bunge S.A. (Id. ¶ 117.) Rather, ADU and IMU allegedly issued false invoices through international wires and/or mails in order to pay off the loans. (Id. ¶¶ 15, 117.)

In addition to transferring money to GRIPT and Bunge S.A., ADU and IMU allegedly transferred other funds – at least $62.5 million in 2006 and 2007 – that it had received from Teledata India to Teledata Marine and Teledata Services, also pursuant to invoices for fictitious consulting services. (Id. ¶¶ 19, 120-21.)  Teledata

Marine and Teledata Services then transferred funds back to Teledata India, as payment for fictitious purchases. (Id. ¶ 120.) Thus, Ramachandran allegedly mislead the banks as well as plaintiffs into believing Teledata India was a profitable business by using "sham" sale and purchase invoices between Teledata India, ADU, IMU, Teledata Marine, and Teledata Services to transfer Teledata India's own funds back to it, in order to create the false appearance of revenue. (Id. ¶ 21.)

        D.    <u>SBI's Role in Effecting the Transfers</u>

Teledata India allegedly transferred funds to ADU and IMU, pursuant to the invoices for fictitious consulting services and imports, using SBI accounts. (Id. ¶ 173.) Indian banking regulations required SBI to inspect each transaction to determine whether the transfer of funds was genuinely made in payment for imports of goods or services into India. (Id.) SBI approved all of Teledata India's transfers to ADU and IMU. (Id.)

Plaintiffs allege that SBI intentionally sought to further the scheme of transferring funds to the Bunge Defendants, through approval of the transfers, because SBI had an interest in relieving itself of potential liability on its guarantees of the "sham" Bunge contracts that it had previously issued. (Id. ¶¶ 132-33, 174.) As of November 2006, SBI had allegedly issued guarantees of Bunge "purchase and sale" contracts valued at around $116 million, and had open guarantees of at least $84 million that SBI would be obligated to honor if Teledata India failed to repay the Bunge Defendants. (Id. ¶ 175.)

E.    The Enterprise Begins to Unravel

Plaintiffs allege that the scheme operated similarly to a Ponzi scheme. (Id. ¶¶ 131-32.) Because Teledata India allegedly had no legitimate revenue from sales to repay the Bunge Defendants, the scheme's profitability depended on being able to obtain new loans to pay the old loans. (Id. ¶¶ 24, 132-33.) However, due to the risk that Teledata India might default in repayment, Bunge would not be able to get investors to fund new loans without obtaining bank guarantees of their fictitious purchase and sale contracts. (Id. ¶¶ 2, 24.)

In late 2006, the Reserve Bank of India ("RBI") allegedly began investigating illegal transactions of the type described above. (Id. ¶ 23.) RBI sent official written notice to all commercial banks in India, including SBI, that parties were using purchase and sale agreement transactions to profit from the interest rate arbitrage, rather than for the purpose of genuine import and export. (Id.) RBI directed banks to "carry out due diligence and verify the track record of such exporters to assess their ability to execute such orders." (Id.)

As a consequence of the RBI notice, SBI stopped providing guarantees of the Bunge purchase and sale agreements. (Id. ¶¶ 24, 131.) Teledata India allegedly had to find a new source of money from which to repay Bunge. (Id. ¶¶ 24, 139.)

F.    Plaintiffs are Defrauded

In 2006, eSys (plaintiff Goel's company) allegedly needed to raise $100 million in order to pay creditors and remain in business after the termination of a major distribution deal. (Id. ¶ 26.) In late 2006, Credit Suisse made a proposal to invest tens of millions in dollars in eSys and conduct an IPO. (Id.)  However, around

November 2006, a Teledata India representative contacted Goel and expressed interest in investing in and acquiring shares of eSys. (Id. ¶ 27.) Plaintiffs allege that Ramachandran and Teledata India misrepresented Teledata India's annual revenue as $238 million in order to fraudulently induce Goel to sell half of his shares. (Id.) Relying on those misrepresentations, Goel forewent the Credit Suisse opportunity, and entered into a Stock Purchase Agreement ("SPA") with Teledata India on November 29, 2006, selling 51% of his shares to Teledata India in exchange for a sum of $105 million. (Id. ¶¶ 28, 140.) This exchange was to take place through use of Rainforest, a special purpose vehicle set up by eSys. (Id. ¶¶ 30, 141.) Goel was to transfer all his shares in eSys to Rainforest, and Teledata India would then deposit $105 million into Rainforest's bank account in exchange for the 51% of the shares in Rainforest. (Id. ¶ 141.) Consequently, eSys would become a wholly owned subsidiary of Rainforest, with Teledata India and Goel owning 51% and 49% of the shares, respectively. (Id. ¶ 142.)

Teledata India secured an $80 million loan from SBI to finance the bulk of the acquisition. (Id. ¶ 29.) However, a significant portion of these funds were allegedly routed out of the Rainforest account through ADU and IMU and transferred to Bunge S.A. and GRIPT as payment for their loans to Teledata India. (Id. ¶¶ 132-33, 174, 177, 179.)[3] Teledata India's first payment on the $80 million

---

[3] Plaintiffs allege that SBI had full knowledge of all these transfers because the funds were transferred from SBI to ADU and IMU, and SBI approved them, as required by Indian law. (Id. ¶ 146.) They further allege that SBI did not restrict the use of funds to their intended purpose under the loan agreement (payment for 51% of the eSys shares) because it wanted Bunge paid so that SBI would not be liable for the guarantees. (Id. ¶ 174.)

loan from SBI was due in August 2007 but Teledata India did not have the funds to pay it. (Id. ¶ 180.) To avoid default, Teledata India and SBI allegedly "arranged" for SBI to issue a "working capital loan" of $12.5 million to eSys on August 14, 2007. (Id. ¶ 181.)  In contravention of SBI's own sanction letter, which stated that the loan was to be used only to fund eSys India's supplier and inventory requirements, SBI allegedly made accounting entries that had the effect of routing $5 million from the eSys account to a Teledata account. (Id. ¶ 183.) The funds were then allegedly used to pay SBI for the first installment of the $80 million loan. (Id.)

By 2008, Teledata India had depleted the funds allegedly stolen from plaintiffs, and had no money to repay GRIPT and Bunge S.A. for the loans. (Id. ¶ 33.) Consequently, the Bunge Defendants, or the investors to which they had sold the loans, made claims on the guarantees, fraudulently representing to banks that the purchased goods had not been delivered pursuant to the contract terms. (Id. ¶¶ 33, 157-59.)  Banks, including HSBC and Canara Bank, honored the demands and paid "tens of millions of dollars." (Id. ¶¶ 34, 162-68.)[4]

Throughout this time period, plaintiffs allege that Teledata India continued to make promises that they would repay money transferred out of Rainforest for purported business reasons, in the form of a short-term loan. (Id. ¶¶ 189-91.)

---

[4] For instance, in September 2008, Bunge S.A. made a $9.9 million demand to HSBC. (Id. ¶ 157.) When HSBC demanded further assurances regarding the grounds for the demand, Bunge S.A. allegedly represented that Teledata India had failed to meet their obligations under the purchase and sale agreement. (Id. ¶¶ 158-60; Ex. A-13, H.)  HSBC and other banks have subsequently sought to recover additional damages from Teledata India related to the guarantees, though with little success. (Id. ¶¶ 162-68.)  The banks' lawsuits to recover money from Teledata India forced Teledata India into insolvency proceedings in India, rendering them unable to pay plaintiffs money owed. (Id. ¶¶ 36, 207.)

Plaintiffs allege that it was not until December 2009, after plaintiffs' relationship with Teledata India had encountered difficulties, that plaintiffs wrote to Bunge Ltd. and Bunge S.A., asking for an explanation of why the funds had been transferred out of the Rainforest accounts to the Bunge Defendants. (Id. ¶ 191.) In a letter dated January 13, 2010, Bunge representatives allegedly misrepresented to plaintiffs that the payments were "in respect of certain contracts for the sale and purchase of goods between Teledata and Bunge S.A." (Id.) Bunge allegedly did not disclose that the contracts were between Teledata India and GRIPT until January 2012, when the court in the state action directed Bunge to produce the contracts. (Id. ¶ 193.) Plaintiffs also allege that the Bunge Defendants misrepresented the true nature of the contracts, which were for the purposes of repaying the illegal loans. (Id. ¶ 194.) As a consequence of these "cover-up" efforts, plaintiffs allege that they did not become aware of the racketeering enterprise until June 2012 when Ramachandran produced documents in response to discovery requests made in the state action. (Id. ¶ 205.)

In 2010, SBI initiated foreclosure proceedings on the Rainforest shares that Teledata India had pledged to SBI in connection with the $80 million loan taken out to finance Teledata India's acquisition of eSys. (Id. ¶ 37.) Deprived of needed cash as a result of Teledata India and SBI's alleged diversion of funds in connection with the $80 million loan and Teledata India's subsequent insolvency, eSys's revenue plummeted from $1.9 billion to below $75 million by 2010. (Id. ¶¶ 37, 179, 184, 208.) Plaintiffs lost their ownership interest in eSys, which had been valued by Credit

Suisse at between $411 and $588 million in 2006. (Id. ¶¶ 37, 136.) Additionally, plaintiffs allege that, due to Teledata India's misrepresentations regarding its revenue, plaintiffs lost the opportunity to proceed with the Credit Suisse proposal. (Id. ¶ 206.)  Plaintiffs allege that these damages were realized in 2011, when SBI reduced eSys's cash credit line, took money from eSys's account to be repaid, and foreclosed on eSys. (Id. ¶ 208.)

## II.   PROCEDURAL HISTORY

### A.   Proceedings Between Goel and Teledata India

In 2009, Goel and Rainforest brought a proceeding in Singapore against Teledata India and its affiliates, based on allegations of fraud and breach of the Stock Purchase Agreement. (Achilles Decl., Ex. C, ECF No. 27; App. R. in Goel I at 690-92.) Goel brought additional proceedings against Teledata India and its affiliates in India, alleging that Teledata India had "maliciously taken an injunction" against Rainforest, Goel, and eSys, by submitting a forged document and committing perjury in a November 2009 action brought by Teledata India against Goel and eSys. (Id. at 693.) Additionally, eSys filed "winding up" and/or bankruptcy proceedings against Teledata India for money allegedly owed to eSys. (Id. at 694.)

### B.   Singapore Foreclosure Proceedings

By letter dated March 24, 2010, SBI declared that "an event of default had occurred under the Facility Agreement" made in connection with its $80 million loan to Teledata India to finance the acquisition of the Rainforest shares. (Pillai Aff. ¶¶ 6-25, Exs. 2-8, ECF No. 24.)  SBI stated that a sum of $41,989,189.91 USD plus

interest that had accrued from the date of default was due by April 2, 2010. As Teledata India failed to make the payment within the deadline, SBI sought to enforce its security in the pledged eSys shares towards repayment of the debt. In response, Rainforest and Goel alleged that SBI's security interest in the pledged shares was tainted by fraud, forgery, and bribery.

On April 8, 2011, the High Court of the Republic of Singapore concluded that the fraud allegations were without merit, that an event of default had occurred, and that SBI was "entitled to enforce its security by selling the pledged shares." On March 21, 2012, a three judge panel of the Singapore Court of Appeals affirmed the High Court's judgment. In post-judgment proceedings, the High Court appointed Deloitte to determine the value of the eSys shares. Deloitte determined that eSys had been technically insolvent since March 2009, and hence, the equity value of the eSys shares pledged to SBI was "nil."

C.    State Court Action

On September 24, 2010, plaintiffs filed an action against Ramachandran, Bunge Ltd., and Bunge S.A. in New York Supreme Court, Westchester County, asserting a claim of fraud against Ramachandran, claims of tortious interference with contract, money had and received, unjust enrichment, and aiding and abetting fraud against Bunge Ltd. and Bunge S.A., and claims of liability against Bunge Ltd. because of its corporate relationship with Bunge S.A. ("Goel I") (Achilles Decl., Ex. C at 8-12.)

On October 24, 2011, Bunge Ltd. and Bunge S.A. moved to dismiss for lack of personal jurisdiction and failure to state a claim. (Id. at 9.)  On April 4, 2012, the

court dismissed plaintiffs' claim against Bunge Ltd. and Bunge S.A. for tortious interference with contract as time-barred, but allowed other claims to proceed. Goel v. Ramachandran, 2012 WL 10095460 (N.Y. Sup. Ct. Apr. 4, 2012). On November 20, 2013, the Appellate Division, Second Department, reversed in part and dismissed the claims against the Bunge Defendants, holding that plaintiffs had failed to state a claim for money had and received, unjust enrichment, aiding and abetting fraud, or piercing the corporate veil. See Goel v. Ramachandran, 975 N.Y.S.2d 428, 437-39 (2d Dep't 2013).

At this point, only a fraud claim against Ramachandran remained.  On December 16, 2013, the New York Supreme Court, Westchester County, held a conference with the parties during which plaintiffs informed Judge Sheinkman that they had a "new pleading" regarding the Bunge Defendants that would remedy the pleading deficiency highlighted by the Appellate Division. (Achilles Decl., Ex. H; 12/16/13 Conference Transcript at 7:13-8:12). Judge Sheinkman expressed a desire to move forward with the claim against Ramachandran, but noted that plaintiffs could file a new case against the Bunge Defendants. (Id. at 9:6-11:15.)  Plaintiffs and Ramachandran subsequently entered into a stipulation of discontinuance, dismissing the action without prejudice. On January 2, 2014, plaintiffs then filed the instant actions with their "new pleading."

III.    STANDARD OF REVIEW

A.    Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir.2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir.2010) (quoting Twombly, 550 U.S. at 570); see also Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663.

For purposes of a motion to dismiss, the Court must accept as true all well-pleaded factual allegations, and draw all reasonable inferences in plaintiffs' favor. See Iqbal, 556 U.S. at 678; Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008). Thus, if a fact is susceptible to two or more competing inferences, the Court must, as a matter of law, draw the inference that favors the plaintiff so long as it is reasonable. See N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 121 (2d Cir.2013).

However, the Court does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. If the court can infer no more than "the mere possibility of misconduct" from the factual averments—in

15

other words, if the allegations of the complaint have not "nudged. . .[the] claims across the line from conceivable to plausible," dismissal is appropriate. Twombly, 550 U.S. at 570; Starr, 592 F.3d at 321 (quoting Iqbal, 556 U.S. at 679).

>    B.    Materials Outside the Complaint

In deciding a Rule 12(b)(6) motion, the Court may consider facts alleged in the Complaint or incorporated in it by reference.  Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).  It can also consider documents that are integral to the Complaint and relied upon therein, even if not attached or incorporated by reference. Broder v. Cablevision Sys. Corp., 418 F.3d 187, 196 (2d Cir. 2005). "Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion." Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 44 (2d Cir. 1991).

For a document to be considered integral to the complaint, the plaintiff must (1) have "notice of all the information in the movant's papers" and (2) rely "on the terms and effect of the document in drafting the complaint . . . mere notice or possession is not enough." Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).  Moreover, even if a document is "integral" to the complaint, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and that there is no material issue of fact regarding the document's relevance. Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006).

It is proper for courts to consider documents from prior litigation when evaluating a motion to dismiss a RICO claim for being time-barred.  See Koch v.

Christie's Int'l PLC, 785 F. Supp. 2d 105, 111-13 (S.D.N.Y. 2011) (considering press reports, court documents and plaintiff's deposition testimony from prior related actions in finding plaintiff's RICO claim time-barred), aff'd, 699 F.3d 141 (2d Cir. 2012); Jackson v. Broad. Music, Inc., No. 04 CV 5948 (TPG), 2006 WL 250524, at *8-9 (S.D.N.Y. Feb. 1, 2006) aff'd, No. 06-2283-CV, 2007 WL 2914516 (2d Cir. Oct. 5, 2007) (considering plaintiff's pleadings and affidavits from prior action in finding plaintiff's fraud claims time-barred); Davis v. Yeroushalmi, 985 F. Supp. 2d 349, 361 (E.D.N.Y. 2013) (considering complaint, affidavits, exhibits, and other court-filed documents from prior litigation in dismissing RICO claims as time-barred).[5]

Here, the Court finds the following materials integral to the Complaint and properly considered in this motion to dismiss: (1) court filings and sworn deposition testimony from the state court action ("Goel I"), and (2) Goel's own affidavit filed in the Singapore Foreclosure Proceeding. The authenticity of such documents is not in dispute.  As a participant in both these actions, plaintiffs had notice of and access to all related filings and testimony. Additionally, plaintiffs filled the Complaint with allegations relying on and referencing the court filings and "sworn testimony" from

---

[5] The Court considered converting this motion to one under Rule 56, but declines to do so given that the only documents it considers outside the four-corners of the Complaint are Goel's own sworn testimony and state court filings. See Kamholtz v. Yates County, 350 Fed. Appx. 589, 592 (2d Cir. 2009) ("Documents 'plaintiffs either possessed or knew about and upon which they relied in bringing the suit' may be incorporated") (quoting Rothman, 220 F.3d at 88-89); Cortec Industries, 949 F.2d at 48 ("Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.").

Goel I in order to detail the Bunge Defendants' intent and how the scheme worked. (Compl. ¶¶ 73, 83, 93, 96, 97, 188.)[6]

## IV.   DISCUSSION

RICO claims are subject to a four-year statute of limitations. Koch v. Christie's Int'l PLC, 699 F.3d 141, 148 (2d Cir. 2012). In a RICO case, the first step in the statute of limitations analysis is to "determine when the plaintiff sustained the alleged injury for which the plaintiff seeks redress." Id. at 150.  The Court then determines when the plaintiff "discovered or should have discovered the injury and begin[s] the four-year statute of limitations period at that point." Id. (citation omitted).  Under the discovery accrual rule, "discovery of the injury, not discovery of the other elements, is what starts the clock." Rotella v. Wood, 528 U.S. 549, 555 (2000). Thus, the RICO statute of limitations "runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 328 F. App'x 695, 697 (2d Cir. 2009).

### A.   Relation Back to the State Court Action

Plaintiffs first attempt to get around the four-year statute of limitations by relating this action to their 2010 state court action.  They assert the applicability of

---

[6] Even if the materials from the state action were not considered integral to the complaint, the Court could still take judicial notice of the court documents and prior litigation, not for the truth but to establish the fact of such filings and litigation. See Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008) (a court may take judicial notice of "the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice . . ."). Plaintiffs argue that FRE 201(e) entitles them to an opportunity to be heard regarding the propriety of this Court taking judicial notice, but the Court denies that request as it need not take judicial notice when the documents are incorporated into the Complaint.

New York's Savings Statute, C.P.L.R § 205(a), under which a plaintiff whose action has been terminated may, under certain conditions, be afforded a six-month grace period in which to commence a new action based on the "same transaction or occurrence or series of transactions or occurrences."  However, plaintiffs here cannot save their claims by relating them back to the state court action.  New York's savings statute does not apply to the civil RICO claims.  First, New York's savings statute is unavailing if a plaintiff's prior action was terminated "by a voluntary discontinuance, a failure to obtain personal jurisdiction over the defendant, a dismissal of the complaint for neglect to prosecute the action, or a final judgment upon the merits." § 205(a).  Here, most of the state court claims were dismissed on the merits for failure to state a claim and the remaining claims were ultimately dismissed without prejudice when plaintiffs and Ramachandran entered into a voluntary stipulation of discontinuance.

In addition, RICO claims are different.  The Supreme Court held in <u>Agency Holding Corp v. Malley-Duff & Assocs., Inc.</u>, 483 U.S. 143, 156 (1987), that the Clayton Act's four-year statute of limitations is the appropriate period for RICO actions and that "there is a need for a uniform statute of limitations for civil RICO, [and] that the Clayton Act provides a . . . closer analogy than any available state statute." Consistent with the concerns for uniformity expressed in <u>Agency Holding</u>, the Second Circuit held that "federal rather than state tolling doctrines should govern in civil RICO actions." <u>Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.</u>, 30 F.3d 339, 347 (2d Cir. 1994); <u>see also</u> <u>Ctr. Cadillac, Inc. v. Bank</u>

<u>Leumi Trust Co. of N.Y.</u>, 808 F. Supp. 213, 225 (S.D.N.Y. 1992) <u>aff'd</u>, 99 F.3d 401 (2d Cir. 1995) (noting that after <u>Agency Holding</u>, "state tolling principles no longer govern civil RICO actions"). Application of the New York savings statute to the civil RICO claims in this action would contradict federal precedent and directly undermine the objective of uniformity the four-year statute of limitations was fashioned to achieve. Defendants here were not on notice of RICO claims by virtue of the state court action (especially when the instant Complaint includes defendants that were not named in the state action). Thus, C.P.L.R. § 205(a) is not applicable to the civil RICO claims and the state court action does not breathe new life into the time-barred claims.

### B.   The Injury

Plaintiffs' injury occurred on November 29, 2006, when they allege that Ramachandran and Teledata India fraudulently induced them to enter into a Stock Purchase Agreement by misrepresenting Teledata India's annual revenue and sales. (Compl. ¶¶ 259-260.) In cases involving a fraudulently induced investment, the investment is "fraudulent at the outset because they could never achieve the promised objectives," and thus, "the injury was ripe, at the time of investment." <u>In re Merrill Lynch Ltd. Partnerships Litig.</u>, 7 F. Supp. 2d 256, 259 (S.D.N.Y. 1997) <u>aff'd</u>, 154 F.3d 56 (2d Cir. 1998); <u>CSI Inv. Partners II, L.P. v. Cendant Corp.</u>, 180 F. Supp. 2d 444, 458 (S.D.N.Y. 2001) (holding that where the complaint alleged that defendants' fraud induced plaintiffs to enter into a purchase agreement on terms plaintiffs would not have accepted had they known the undisclosed facts, the injury occurred when plaintiffs entered into the purchase agreement on those terms).

Plaintiffs incorrectly argue that the injury was not ripe until it became "definite" in 2011, when SBI foreclosed on eSys's shares, and that, at the very least, the 2011 event is a separate and distinct injury.  This argument is without merit. Under the separate accrual rule, "a new claim accrues, triggering a new four-year limitations period, each time plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." Bingham v. Zolt, 66 F.3d 553, 559 (2d Cir. 1995). However, "a continuing series of fraudulent transactions undertaken within a common scheme can produce multiple injuries" so the injury must be "new and independent to be actionable." In re Merrill Lynch, 154 F.3d at 59 (holding that the collection of subsequent fees was simply a consequence of the original fraudulent investment rather than an independent injury); World Wrestling Entm't., 530 F. Supp. 2d at 527 (refusing to extend the statute of limitations for plaintiff's continued below-market royalties because they were merely "subsequent costs associated with the initial injury").  Similar to Merrill Lynch and World Wrestling, the 2011 foreclosure of the eSys shares was merely a "subsequent cost[] associated with the initial injury."  See id.  The foreclosure was not a separate and independent injury where SBI merely sought to enforce its security interest in the eSys shares that were pledged to them in 2006 when it gave Teledata India a $80 million loan to finance the bulk of its acquisition.

C.    Inquiry Notice

In addition to determining when the injury occurred, the Court must also determine when inquiry notice began. "[C]ourts can 'readily resolve the issue' of inquiry notice as a matter of law on a motion to dismiss—as has been done in 'a vast

number of cases' in this circuit—where 'the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint.'" Staehr, 547 F.3d at 412 (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005)).  Inquiry notice may be found "only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct." Id. at 427.  "'Storm warnings' need not detail every aspect of the alleged fraudulent scheme." Id.  Rather, the issue is whether the objective facts and circumstances would have been sufficient to put a person of "ordinary intelligence" on inquiry notice.  Id.

Plaintiffs assert that they had no notice of an injury through late 2009 because, at this point, eSys was still a profitable company and Teledata India had misled them into believing that the money taken out of Rainforest was for legitimate business reasons and would be returned. (Compl. ¶ 191.) Further, plaintiffs argue that Goel had only heard general unsubstantiated statements and did not have admissible proof of the particulars of the fraud until June 2012, when the plaintiffs obtained discovery in the state court action.  Even if the Court were to credit this chronology, the law does not require Goel to have understood all the nuance of the racketeering scheme for inquiry notice to trigger.  The statute of limitations begins to accrue "on the date that plaintiff[s] discover[] or should have discovered the injury," and "storm warnings" sufficient to put a party on inquiry notice "need not detail the entire fraud." Koch, 699 F.3d at 149; see also Staehr, 547

F.3d at 434.  Moreover, "[a] claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence." Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998).

Goel's own deposition testimony from the state action on which he relies in his Complaint, dated January 13, 2012, provides clear indication that he was well aware of the fraud as early as 2007.  In that deposition, Goel testified that in 2007 he had a meeting with Mr. Padmanabhan, a Teledata India Managing Director, wherein Padmanabhan told him that "there were no real sales, there was no real product, it was all fluff, a story" and that Bunge was "participating in a knowingly intentional false contract." (Rosner Decl., Ex. 2, ECF No. 23; Goel Deposition Testimony from State Action at 465:18-467:24.)  Goel subsequently confirmed having learned in 2007 during his travels to Teledata India's various locations for a "round-the-world trip" he took in response to Teledata India's offer that he become Teledata India's CEO "that Teledata had no business, no product, [and] no dealings of real products with Bunge."  (Id. at 468:1-469:7.)  Goel testified that he declined the CEO offer because he realized that Teledata "was absolutely a sham, zero, not even like 10 or 20 percent real." (Id. at 471:23-472:7.) Moreover, Goel testified that Teledata India representatives continued telling him details of the scheme involving the Bunge Defendants, because around this time they could no longer "roll over more transactions" and they wanted Goel's help to find another company that could "replace the Bunge kind of false, fraudulent transactions." (Id. at 469:20-470:5.)

Plaintiffs brought arbitration proceedings against Teledata India – but not the defendants in this action – in Singapore in 2009 for its alleged breach of the SPA. At that proceeding, which plaintiffs rely on in their Complaint, Goel further made clear that he was on inquiry notice of the role defendants played in the scheme. In an affidavit for the Singapore Foreclosure Proceedings, dated April, 27, 2011, Goel declared that Padmanabhan told him in early 2007 that Teledata India had bribed various officers of SBI India to obtain the $80 million loan. (Pillai Aff. ¶¶ 126-28.) Additionally, Goel stated that, around May 2007, Ramachandran and Padmanabhan explained the scheme to him in detail, telling him that there was an arrangement between Teledata India, Bunge Ltd. and Bunge S.A., and SBI India, whereby Bunge Ltd. and Bunge S.A. would enter into fictitious contracts with Teledata India, and for which SBI would issue guarantees. (Id. at ¶¶ 62-67.)

The Complaint itself demonstrates that plaintiffs were aware that Teledata India was transferring funds out of the Rainforest account to Bunge S.A. as early as February 6 and February 9, 2007. (Compl. ¶¶ 189-190.)[7] Plaintiffs state that in late 2009, "after Plaintiffs' relationship with Teledata India was falling apart," plaintiffs wrote directly to Bunge Ltd. and Bunge S.A about the transfer of funds. (Id. ¶ 191.) Plaintiffs requested a return of the money, and stated that Rainforest had no records that the Bunge Defendants had provided any services or products and that

---

[7] Goel also testified in the state action that Rainforest officials were "initially hesitant to effect the transfer of funds." (Rosner Decl. at 210:8-24, 237:12-17.) Goel further testified that Teledata India never returned the money, despite insistence that it was merely making payments to their suppliers and the money would be promptly returned, and, in March 2007, Teledata India subsequently promised that Rainforest would be repaid with 1% interest per month or 12% interest per annum. (Id. at 242:1-243:23.)

Rainforest was unable to "ascertain the basis for these remittances." (Achilles Decl. Ex. B; State Compl. from <u>Goel I</u>.)

The facts in the Complaint combined with Goel's admissions in both his sworn deposition testimony and affidavit lead to only one determination: plaintiffs had knowledge of the alleged fraudulent racketeering scheme and the respective roles of the defendants by late 2007 at the latest.[8]  Given Goel's knowledge of Teledata India's alleged misrepresentations, lack of revenue, history of fraudulent activity, as well as the transfer of funds out of Rainforest, a person of ordinary intelligence would have been on inquiry notice by late 2007 that the transfers were not truly being paid to suppliers and that defendants had likely defrauded them.

    D.    <u>Reasonable Diligence</u>

Inquiry notice "gives rise to a duty of inquiry." <u>Koch</u>, 699 F.3d at 151 (quoting <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161 (2d Cir. 2005)). When this duty arises, knowledge of the fraud will be timed in one of two ways for statute of limitation purposes: (1) "if a Rico plaintiff 'makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose;" and (2) "where a RICO plaintiff does begin . . . to inquire once the duty arises, the Court must determine

---

[8] While Goel's admissions are sufficient to illustrate the fact that he was on inquiry notice of Bunge Ltd.'s, Bunge S.A's, Teledata India, and SBI's alleged roles in the fraudulent scheme by late 2007, plaintiffs claim that they had no knowledge of GRIPT's involvement until they received discovery in the state action in 2012, and that therefore the four-year statute of limitations period begins to run for GRIPT from that date.  They cite <u>JSC Foreign Econ. Ass'n Technostroyexport v. Weiss</u>, No. 06 Civ. 6095 (JGK), 2007 WL 1159637, at *5 (S.D.N.Y. Apr. 17, 2007), for the proposition that "the statute of limitations is triggered only as to those defendants about whom the plaintiffs were on notice."  This case is inapposite as GRIPT is not an independent defendant, but a subsidiary of Bunge Ltd., a defendant for which the plaintiff had knowledge of its involvement beginning in 2007.

when a reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence, and the statute of limitations begins to run on that date." Id. at 151, 153 (citing Lentell, 396 F.3d at 168).

Plaintiffs argue that even if they were on inquiry notice earlier than 2012, they conducted a "reasonably diligent investigation" from 2009 onwards and only discovered admissible evidence of the injury in 2012 during the state action. As previously noted, however, there were "storm warnings" (if not direct knowledge) by late 2007 that Teledata India had likely fraudulently induced plaintiffs into entering into the SPA. There was no "reasonably diligent investigation" as plaintiffs waited two years before contacting Bunge in late 2009 about the nature of the transactions. (Compl. ¶ 191.) Plaintiffs emphasize that they did not truly learn of the fraud until obtaining discovery in the state court action; however, they waited nearly three years after becoming aware of the racketeering scheme to file suit and initiate the discovery process. This does not constitute a reasonably diligent investigation such that the four-year statute of limitations should begin in 2012. See Koch, 699 F.3d at 153 (holding no reasonably diligent investigation where defendant did not begin to inquire for over four years). Accordingly, knowledge of the injury is properly imputed as of the date the duty to inquire arose, around late 2007.[9]

---

[9] Plaintiffs assert that they are entitled to equitable tolling of the statute of limitations on the basis of the defendant's alleged fraudulent concealment. "Under federal common law, a statute of limitations may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's 'discovery of the nature of the claim within the limitations period'; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." Koch, 699 F.3d at 156 (quoting Corcoran v. N.Y. Power Auth.,

E.    Remaining State Law Claims

There is no dispute that, of the claims asserted in the Complaint, only the civil RICO claims arise under federal law.  A district court "may decline to exercise supplemental jurisdiction over a claim in subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  Accordingly, having dismissed all the federal claims, the Court declines to exercise supplemental jurisdiction, and remands the state law claims to the New York State Supreme Court, Westchester County where this case was originally filed.  See Valencia ex rel. Franco v. Lee, 316 F.3d 299, 308 (2d Cir. 2003) ("Because this case was commenced in state court, the district court should remand the action to the state court in which it was originally filed.").

V.    CONCLUSION

Because the Court finds that plaintiff's federal claims are untimely, and it declines to exercise supplemental jurisdiction over the state law claims, the motions to dismiss are GRANTED and the action is DISMISSED.

The Court notes that defendants Ramachandran, ADU, IMU, Teledata Marine, and Teledata Services are not represented by counsel in this action and were not parties to these motions to dismiss.  While the rationale of this Opinion applies to those defendants, who are effectively included as related to the moving parties, the parties shall submit a letter not later than **August 19, 2015** if they

---

202 F.3d 530, 543 (2d Cir. 1999)).  Here, plaintiffs cannot take advantage of the equitable tolling provision because they knew the nature of their claim within the statutory period and, as discussed above, they did not exercise reasonable diligence to uncover the alleged fraud.  See Corcoran, 202 F.3d at 543.

believe that this case should not be terminated on account of those defendants'

non-appearance in this action.

The Clerk of Court is directed to close the motions at ECF No. 21 and 25, and

to terminate the actions at both 14-cv-1895 and 14-cv-2053.

SO ORDERED.

Dated:       New York, New York
             August 26, 2015

_____
KATHERINE B. FORREST
United States District Judge

28