UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

VIKAS GOEL AND RAINFOREST TRADING
LTD.,

                Plaintiffs,

          -v-

AMERICAN DIGITAL UNIVERSITY, INC.,
INTERNATIONAL MARITIME UNIVERSITY,
LLC, TELEDATA MARINE SYSTEMS LLC,
TELEDATA SYSTEMS AND SERVICES, LLC,
BUNGE LIMITED, BUNGE S.A., GRAINS AND
INDUSTRIAL PRODUCTS PTE LTD., ANUSH
RAMCHANDRAN AND STATE BANK OF
INDIA

                Defendants.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 21, 2017

14-cv-2053 (KBF)
14-cv-1895 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On January 2, 2014, plaintiffs Vikas Goel and Rainforest Trading Ltd.

commenced this action against American Digital University, Inc. ("ADU"),

International Maritime University, LLC ("IMU"), Teledata Marine Systems, LLC

("Teledata Marine"), Teledata Systems and Services, LLC ("Teledata Services"),

Bunge Limited ("Bunge Ltd."), Bunge S.A., Grains and Industrial Products PTE

Ltd. ("GRIPT"), Anush Ramachandran, and the State Bank of India ("SBI") in the

Supreme Court of the State of New York, Westchester County.  (Notice of Removal,

ECF No. 1.)[1]  Plaintiffs allege that defendants carried out a racketeering scheme, in

---

[1] In March 2014, defendants removed this action to the United States District Court for the Southern
District of New York.  On August 19, 2014, Judge Karas consolidated what had been separate cases
against SBI and against the Bunge defendants.  On March 6, 2015, this action was reassigned to the

violation of 18 U.S.C. §§ 1962(a), 1962(c), and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), designed to mislead and defraud plaintiffs.  The complaint also includes state law claims for aiding and abetting fraud, money had and received, and establishing liability to parent company Bunge Ltd. on the basis of piercing the corporate veil liability.

Pending before the Court are two motions for summary judgment—one from Bunge Ltd., Bunge S.A., and GRIPT (collectively, the "Bunge Defendants"), and one from SBI.  (ECF Nos. 21, 25.)[2]  For the reasons set forth below, both motions are GRANTED.  The undisputed facts demonstrate that plaintiffs' RICO claim is untimely—thus eliminating the sole basis for federal jurisdiction.  In addition, as to SBI, the Court separately finds that it is immune from suit pursuant to the Foreign Sovereign Immunities Act.

Also before the Court is a motion by the Bunge Defendants for sanctions against plaintiffs under Rule 11 of the Federal Rules of Civil Procedure.  For the reasons described below, this motion is DENIED.

I.     BACKGROUND

The facts of this case are somewhat complex.  In sum, and as described in more detail below, plaintiffs assert that Goel was fraudulently induced by a non-party (Teledata Informatics, Ltd. ("Teledata India")) to transfer a majority stake in

---

undersigned.  This Court's citations to docket entries correspond with case number 14-cv-2053, the lead case.

[2] Defendants initially moved to dismiss plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Court has converted those motions to motions for summary judgment.  (ECF No. 88.)

his company—eSys Technologies Pte Ltd ("eSys")—to Rainforest Trading Ltd. ("Rainforest").   Funds transferred to Rainforest in connection with that transfer were then allegedly improperly transferred in furtherance of a fraudulent mail and wire fraud scheme perpetrated by Teledata India and the other defendants. Ultimately, these transfers drained available financial resources from eSys and the company failed.   Plaintiffs, in particular Goel, have commenced various actions in various places for injuries arising from that failure.

The procedural history of this action and related actions is also somewhat complex.   However, the important facts are: (1) in a foreign proceeding that plaintiffs discuss in their instant complaint, Goel submitted an affidavit in which he acknowledged knowing of various fraudulent conduct that put plaintiffs on actual (or inquiry) notice as of 2007; (2) Goel and Rainforest commenced an action in New York State Court in 2010 against some but not all of the defendants herein, on materially the same facts and overlapping claims; and (3) the RICO claims here asserted, along with joinder of additional defendants, appears to be an attempt to get plaintiffs claims into federal court and improve their chances of recovery.   As described below, while it may be that plaintiffs had a real RICO claim, the time to bring such claim in federal court has run.

A.    The Parties

Plaintiff Vikas Goel was the founder, Chairman, Managing Director, and 99.9% shareholder of eSys Technologies Pte Ltd. ("eSys"), a computer equipment distribution company.   (Compl. ¶ 50.)   Plaintiff Rainforest Trading, Ltd. ("Rainforest") was a corporation established as a holding company to facilitate

payment by non-party Teledata Informatics, Ltd. ("Teledata India") for 51% of Goel's eSys shares.  (Id. ¶¶ 51, 141.)

Defendants in this action can be separated into the following three groups: (1) Anush Ramachandran and his related entities; (2) the "Bunge Defendants"; and (3) the State Bank of India ("SBI").

Ramachandran was the Chief Executive Officer of Teledata India, a non-party to this suit, who is presently in arbitration with plaintiffs in Singapore. (Id. ¶¶ 52, 59-61.)  Ramachandran also allegedly owned and controlled American Digital University, Inc. ("ADU"), International Maritime University, LLC ("IMU"), Teledata Marine Systems, LLC ("Teledata Marine"), and Teledata Systems and Services, LLC ("Teledata Services").  (Id. ¶ 52.)  ADU purported to be an online university, and IMU was a division of ADU.  (Id. ¶ 53.)  However, both entities allegedly had a total of just three employees, their address was Ramachandran's home in Scarsdale, and there were no professors or students.  (Id. ¶¶ 12, 53-54.)  Plaintiff alleges that they were sham companies used to illegally transfer funds as a part of the racketeering scheme.  (Id. ¶¶ 12-13, 54.)  Teledata Marine and Teledata Services were also allegedly sham companies, purporting to sell software, used in the scheme to fraudulently inflate Teledata India's sales and revenue.  (Id. ¶¶ 17-21, 55-58.)

The Bunge Defendants include Bunge Ltd., Bunge S.A., and Grains and Industrial Products PTE Ltd. ("GRIPT").  (Id. ¶¶ 62-67.)  Bunge Ltd. is a publicly traded agribusiness company with headquarters in White Plains, NY.  (Id. ¶ 62.)

Bunge S.A., headquartered in Geneva, Switzerland, and GRIPT, headquartered in Singapore, are subsidiaries of Bunge Ltd. that purport to be agricultural products trading enterprises.  (Id. ¶¶ 66-67.)  Plaintiffs allege that Bunge Ltd. used those two subsidiaries to further the racketeering scheme.  (Id. ¶ 64.)

SBI is the State Bank of India.  (Id. at ¶ 68.)  It has a branch in New York ("SBI-NY"), which it allegedly used to transfer substantial sums of money in support of the racketeering scheme.  (Id.)

B.     Bunge's "Sham Contracts"

Plaintiffs allege that the Bunge Defendants illegally loaned money to Teledata India for the purpose of profiting from India's high interest rates.  (Compl. ¶¶ 1-2.)  Plaintiffs claim that it was illegal for the Bunge Defendants to lend money to Indian companies because they were not authorized lenders under India's Foreign Exchange Management Act of 1999.  (Id. ¶ 3.)  In order to sidestep Indian law, Bunge Ltd. allegedly disguised its loans by using subsidiaries Bunge S.A. and GRIPT to enter into contracts for the purchase and sale of fictional goods with Teledata India.  (Id. ¶ 4.)  Bunge S.A. and GRIPT entered into more than twenty "sham contracts" with Teledata India over a two-year period, valued at an excess of $150 million.  (Id.)  On their face, the purchase and sale contracts appeared to be genuine, detailing the purchase price, product to be sold, and delivery terms.  (Id. ¶ 5.)  In these contracts, the Bunge Defendants agreed to buy a product from Teledata India, for which delivery would be due in one year.  (Id.)  Despite over $150 million in such contracts, the Bunge Defendants allegedly never bought, took delivery of, or asked Teledata India to deliver a single product.  (Id.)  Instead,

Teledata India would repay the money with interest to the Bunge Defendants at the one-year delivery date.  (Id.)

The Bunge Defendants forwarded these "sham sales and purchase contracts" to banks (including SBI), which would in turn issue "advance payment" guarantees. (Id. ¶¶ 6-7.)  These guarantees were, in effect, loans—the banks would compensate the Bunge Defendants for the money advanced if Teledata India failed to deliver the contracted-for goods.  In the event that Teledata India failed to pay the Bunge Defendants back, the Bunge Defendants could fraudulently represent to the banks that Teledata India had failed to deliver the products and demand the guarantee of the advance payments.  The bank guarantees made the loans essentially risk-free to the Bunge Defendants, allowing them to profit from the difference between the interest rates on the loans they borrowed from investors outside India and the repayments by Teledata India at the Indian interest rate, which was significantly higher.  (Id. ¶ 9.)

Teledata India had to appear to be a profitable business to obtain the guarantees.  (Id. ¶ 7.)  Thus, the false purchase and sale contracts allegedly served the additional purpose of allowing Teledata India to inflate its revenue to $238 million in their March 2007 annual report, $130 million of which reportedly came from the fictitious sales to Bunge S.A.  (Id. ¶ 16.)

C.    ADU and IMU Aid Teledata India's Illicit Repayment of Loans

Indian currency regulations mandate that an authorized bank, which reports to the Reserve Bank of India ("RBI"), must approve the transfer of money out of India to repay loans.  (Compl. ¶ 10.)  While money could not legally be transferred

out of India to repay loans, money could be transferred out of India to pay for services rendered.  Thus, in order to repay the loans, Ramachandran-controlled Teledata India allegedly evaded Indian currency restrictions by using false invoices to transfer in excess of $127 million during 2006 and 2007 to the New York bank accounts of Ramachandran-controlled AMU and IMU as supposed payment for imports and consulting charges.  (Id. ¶¶ 11-13.)

Ramachandran then allegedly transferred a portion of the funds out of ADU and IMU's New York bank accounts to GRIPT and Bunge S.A. in payment of the Bunge Defendants' loans to Teledata India.  (Id. ¶ 14.)  ADU and IMU transferred more than $54 million from their accounts to the Bunge Defendants, either directly or indirectly through other Ramachandran companies, in around 55 transfers between 2006 and 2007.  (Id.)  ADU and IDU transferred these funds, despite not buying any products or having a contractual relationship with GRIPT or Bunge S.A.  Rather, ADU and IMU allegedly issued false invoices through international wires and/or mails in order to pay off the loans.  (Id. ¶¶ 15, 117.)

In addition to transferring money to GRIPT and Bunge S.A., ADU and IMU allegedly transferred other funds that it had received from Teledata India—at least $62.5 million in 2006 and 2007—to Teledata Marine and Teledata Services, also pursuant to invoices for fictitious consulting services.  (Id. ¶ 19.)  Teledata Marine and Teledata Services then transferred funds back to Teledata India, as payment for fictitious purchases.  (Id. ¶ 20.)  Thus, Ramachandran allegedly mislead the banks as well as plaintiffs into believing Teledata India was a profitable business by

7

using "sham" sale and purchase invoices between Teledata India, ADU, IMU, Teledata Marine, and Teledata Services to transfer Teledata India's own funds back to it, in order to create the false appearance of revenue.  (Id. ¶¶ 21-21.)

        D.     <u>SBI's Role in Effecting the Transfers</u>

Teledata India allegedly transferred funds to ADU and IMU, pursuant to the invoices for fictitious consulting services and imports, using SBI accounts.  (Compl. ¶ 173.)  Indian banking regulations required SBI to inspect each transaction to determine whether the transfer of funds was genuinely made in payment for imports of goods or services into India.  (Id.)  SBI approved all of Teledata India's transfers to ADU and IMU.  (Id.)

Plaintiffs allege that SBI intentionally sought to further the scheme of transferring funds to the Bunge Defendants, through approval of the transfers, because SBI had an interest in relieving itself of potential liability on its guarantees of the "sham" Bunge contracts that it had previously issued.  (Id. ¶ 174.)  As of November 2006, SBI had allegedly issued guarantees of Bunge "purchase and sale" contracts valued at around $116 million, and had open guarantees of at least $84 million that SBI would be obligated to honor if Teledata India failed to repay the Bunge Defendants.  (Id. ¶ 175.)

        E.     <u>The Enterprise Begins to Unravel</u>

Plaintiffs allege that the scheme operated similarly to a Ponzi scheme. Because Teledata India allegedly had no legitimate revenue from sales to repay the Bunge Defendants, the scheme's profitability depended on being able to obtain new loans to pay the old loans.  Due to the risk that Teledata India might default in

repayment, there was also a risk that the Bunge defendants would not be able to get investors to fund new loans without obtaining bank guarantees of their fictitious purchase and sale contracts.

In late 2006, the Reserve Bank of India ("RBI") allegedly began investigating illegal transactions of the type described above.  (Compl. ¶ 131.)  RBI sent official written notice to all commercial banks in India, including SBI, that parties were using purchase and sale agreement transactions to profit from interest rate arbitrage, rather than for the purpose of genuine import and export.  (Id.; Compl. Ex. B.)  RBI directed banks to "carry out due diligence and verify the track record of such exporters to assess their ability to execute such orders."  (Compl. Ex. B.)

As a consequence of the RBI notice, SBI stopped providing guarantees of the Bunge Defendants' purchase and sale agreements.  (Compl. ¶ 131.)  Teledata India allegedly had to find a new source of money from which to repay the Bunge Defendants.  (Id.)

F.    Plaintiffs are Defrauded

In 2006, eSys (plaintiff Goel's company) allegedly needed to raise $100 million in order to pay creditors and remain in business after the termination of a major distribution deal.  (Compl. ¶ 135.)  In late 2006, Credit Suisse made a proposal to invest tens of millions of dollars in eSys and conduct an IPO.  (Id. ¶ 136.)  However, around November 2006, a Teledata India representative contacted Goel and expressed interest in investing in and acquiring shares of eSys. (Id. ¶ 137.)  Plaintiffs allege that Ramachandran and Teledata India misrepresented Teledata India's annual revenue as $238 million in order to

9

fraudulently induce Goel to sell half of his shares in eSys.  (Id. ¶¶ 137-38.)  Relying on those misrepresentations, Goel forewent the Credit Suisse opportunity and entered into a Stock Purchase Agreement ("SPA" or "Agreement") with Teledata India on November 29, 2006, selling 51% of his shares in eSys to Teledata India in exchange for a sum of $105 million.  (Id. ¶ 140.)  This exchange was to take place through use of Rainforest, a special purpose vehicle set up by eSys.  (Id. ¶ 141.)  Goel was to transfer all his shares in eSys to Rainforest, and Teledata India would then deposit $105 million into Rainforest's bank account in exchange for the 51% of the shares in Rainforest.  (Id.)  Consequently, eSys would become a wholly owned subsidiary of Rainforest, with Teledata India and Goel owning 51% and 49% of the shares, respectively.

Teledata India secured an $80 million loan from SBI to finance the bulk of the acquisition.  (Id. ¶ 142.)  However, a significant portion of these funds were allegedly routed out of the Rainforest account through ADU and IMU and transferred to Bunge S.A. and GRIPT as payment for their loans to Teledata India.  (Id. ¶ 143.)[3]

Teledata India's first payment on the $80 million loan from SBI was due in August 2007 but Teledata India did not have the funds to pay it.  (Id. ¶ 180.)  To avoid default, Teledata India and SBI allegedly "arranged" for SBI to issue a "working capital loan" of $12.5 million to eSys on August 14, 2007.  (Id. ¶ 181.)  In

---

[3] Plaintiffs allege that SBI knew about and facilitated these transfers.  They further allege that SBI did not restrict the use of funds to their intended purpose under the loan agreement (i.e. solely as payment for 51% of the eSys shares) because it wanted the Bunge Defendants to be paid so that SBI would not be liable for the guarantees.

contravention of SBI's own sanction letter, which stated that the loan was to be used only to fund eSys India's supplier and inventory requirements, SBI allegedly made accounting entries that had the effect of routing $5 million from the eSys account to a Teledata account.  (Id. ¶¶ 182-83.)  The funds were then allegedly used to pay SBI for the first installment of the $80 million loan.  (Id. ¶¶ 183-84.)

As part of its payment obligation to plaintiffs, Teledata India also caused $55 million to be transferred into the Rainforest account in February 2007.  (Id. ¶ 144.) Plaintiffs allege that Teledata India then lied to plaintiffs that those sums needed to be transferred out of Rainforest for legitimate business reasons and would be returned shortly.  (Id.)  According to plaintiffs, the sums were then transferred from the Rainforest account to affiliates of Ramachandran and Teledata India (and Bunge S.A. directly) as a loan.  (Id. ¶ 145.)

By 2008, Teledata India had depleted the funds allegedly stolen from plaintiffs, and had no money to repay GRIPT and Bunge S.A. for outstanding loans (i.e. the sham contracts).  (Id. ¶ 33.)  Consequently, the Bunge Defendants, or the investors to which they had sold the loans, made claims on the guarantees, fraudulently representing to banks that the purchased goods had not been delivered pursuant to the contract terms.  (Id. ¶¶ 33, 157-59.)  Banks, including HSBC and Canara Bank, honored the demands and paid "tens of millions of dollars."[4]  (Id. ¶¶ 157, 162, 164.)

---

[4] For instance, in September 2008, an assignee on behalf of Bunge S.A. made a $9.9 million demand to HSBC.  (Compl. ¶ 157.)  When HSBC demanded further assurances regarding the grounds for the demand, Bunge S.A. allegedly represented that Teledata India had failed to meet their obligations under the purchase and sale agreement.  (Id. ¶ 158.)  HSBC and other banks have subsequently

Throughout this time period, plaintiffs allege that Teledata India continued to make promises that they would repay money transferred out of Rainforest for purported business reasons.  (Id. ¶ 191.)  Plaintiffs allege that it was not until late-2009, after plaintiffs' relationship with Teledata India had encountered difficulties, that plaintiffs wrote to Bunge Ltd. and Bunge S.A. asking for an explanation of why funds had been transferred out of the Rainforest accounts to the Bunge Defendants.  (Id.)  In a letter dated January 13, 2010, Bunge representatives allegedly misrepresented to plaintiffs that the payments were "in respect of certain contracts for the sale and purchase of goods between Teledata and Bunge S.A."  (Id.)  Bunge allegedly did not disclose that the contracts were between Teledata India and GRIPT until January 2012, when the court in the New York State action directed Bunge to produce the contracts.  (Id. ¶ 193.)  Plaintiffs also allege that the Bunge Defendants misrepresented the true nature of the contracts, which were for the purposes of repaying the illegal loans.  (Id. ¶¶ 193-94.)  As a consequence of these "cover-up" efforts, plaintiffs allege that they did not become aware of the racketeering enterprise until June 2012 when Ramachandran produced documents in response to discovery requests made in the New York State action.

In 2010, SBI initiated foreclosure proceedings on the Rainforest shares that Teledata India had pledged to SBI in connection with the $80 million loan taken out to finance Teledata India's acquisition of eSys.  (Id. 37.)  Deprived of needed cash as

---

sought to recover additional damages from Teledata India related to the guarantees, though with little success.  The banks' lawsuits to recover money from Teledata India forced Teledata India into insolvency proceedings in India, rendering them unable to pay plaintiffs money owed.  (Id. ¶ 168.)

a result of Teledata India and SBI's alleged diversion of funds in connection with the $80 million loan and Teledata India's subsequent insolvency, eSys's revenue plummeted from $1.9 billion to below $75 million by 2010.  (Id.)  Plaintiffs lost their ownership interest in eSys, which had been valued by Credit Suisse at between $411 and $588 million in 2006.

## II.    PROCEDURAL HISTORY[5]

### A.    Proceedings in Singapore[6]

In 2009, Goel and Rainforest brought a proceeding in Singapore against Teledata India and its affiliates, based on allegations of fraud and breach of the Stock Purchase Agreement.  (See Declaration of Jennifer L. Achilles in Support of the Bunge Defendants' Motion to Dismiss ("Achilles Decl.") Ex. I, ECF No. 27-36; see also Achilles Decl. Ex. C-5, ECF No. 27-29, at 62-64.)

SBI also initiated foreclosure proceedings against the Rainforest shares in Singapore.  By letter dated March 25, 2010, SBI declared that "an event of default had occurred under the Facility Agreement" made in connection with its $80 million loan to Teledata India to finance the acquisition of the Rainforest shares.  (Affidavit

---

[5] Plaintiffs argue that this Court should deny the motions for summary judgment as premature under Rule 56(d) of the Federal Rules of Civil Procedure.  (Declaration of Robert C. Sentner in Opposition to Summary Judgment ¶¶ 33, 46, ECF No. 89.)  That request is DENIED.  As set forth below, the Court's decision depends on facts within plaintiffs' control or as to which specific discovery has not been sought.

[6] Goel brought additional proceedings against Teledata India and its affiliates in India in 2009, alleging that Teledata India had "maliciously taken an injunction" against Rainforest, Goel, and eSys, by submitting a forged document and committing perjury in a November 2009 action brought by Teledata India against Goel and eSys.  (Achilles Decl. Ex. C-5, at 62-64.)  Additionally, eSys filed "winding up" and/or bankruptcy proceedings against Teledata India for money allegedly owed to eSys.  (See id.)

of Pradeep Pillai ("Pillai Aff.") Ex. 2[7] ¶¶ 31, 38, ECF No. 24-2.)  SBI stated that a sum of $41,989,189.91 USD plus interest that had accrued from the date of default was due by April 2, 2010.  (Id. ¶ 23.)  As Teledata India failed to make the payment within the deadline, SBI sought to enforce its security in the pledged eSys shares towards repayment of the debt.  In response, Goel and Rainforest alleged that SBI's security interest in the pledged shares was tainted by fraud, forgery, and bribery. (Id. ¶ 31; see also ECF No. 24-6.)

On April 8, 2011, the High Court of the Republic of Singapore concluded that the fraud allegations were without merit, that an event of default had occurred, and that SBI was "entitled to enforce its security by selling the pledged shares."  (Pillai Aff. Ex. 2 ¶ 30.)  On March 21, 2012, a three judge panel of the Singapore Court of Appeals affirmed the High Court's judgment.  (See Pillai Aff. Ex. 4, ECF No. 24-4.) In post-judgment proceedings, the High Court appointed Deloitte to determine the value of the eSys shares.  Deloitte determined that eSys had been technically insolvent since March 2009, and hence, the equity value of the eSys shares pledged to SBI was "nil."  (See Pillai Aff. Ex. 5, ECF No. 24-5.)

    B.    New York State Action

In late-2010, plaintiffs filed an action against Ramachandran, Bunge Ltd., and Bunge S.A. in New York Supreme Court, Westchester County ("Goel I"), asserting a claim of fraud against Ramachandran; claims of tortious interference with contract, money had and received, unjust enrichment, and aiding and abetting

---

[7] This exhibit is a certified copy of the judgment issued in the Singapore foreclosure proceedings.

fraud against Bunge Ltd. and Bunge S.A.; and claims of liability against Bunge Ltd. because of its corporate relationship with Bunge S.A.  (See Achilles Decl. Ex. C.)

On October 24, 2011, Bunge Ltd. and Bunge S.A. moved to dismiss for lack of personal jurisdiction and failure to state a claim.  (Id. at 9.)  On April 4, 2012,[8] the court dismissed plaintiffs' claim against Bunge Ltd. and Bunge S.A. for tortious interference with contract as time-barred, but allowed other claims to proceed.  Goel v. Ramachandran, 2012 WL 10095460 (N.Y. Sup. Ct. Apr. 4, 2012).  On November 20, 2013, the Appellate Division, Second Department, reversed in part and dismissed the claims against the Bunge Defendants, holding that plaintiffs had failed to state a claim for money had and received, unjust enrichment, aiding and abetting fraud, and piercing the corporate veil.  See Goel v. Ramachandran, 975 N.Y.S.2d 428, 437-39 (N.Y. App. Div. 2d Dep't 2013).

At this point, only a fraud claim against Ramachandran remained.  On December 16, 2013, the New York Supreme Court, Westchester County, held a conference with the parties during which plaintiffs informed Judge Sheinkman that they had a "new pleading" regarding the Bunge Defendants that would remedy the pleading deficiency highlighted by the Appellate Division.  (12/16/13 Conference Transcript[9] at 7:13-8:12.)  Judge Sheinkman expressed a desire to move forward with the claim against Ramachandran but noted that plaintiffs could file a new case

---

[8] The case was removed from, and then remanded back to, state court.  See Goel v. Ramachandran, 823 F. Supp. 2d 206 (S.D.N.Y. 2011).

[9] The Transcript is attached as Exhibit H to Achilles Declaration (ECF No. 27-35).

against the Bunge Defendants.  (Id. at 9:6-11:15.)  Plaintiffs and Ramachandran subsequently entered into a stipulation of discontinuance, dismissing the action without prejudice.  On January 2, 2014, plaintiffs then filed the instant actions with their "new pleading."

      C.      Proceedings Before This Court and the Second Circuit

By Opinion & Order dated August 6, 2015, this Court dismissed this action pursuant to Rule 12(b)(6), finding that plaintiffs' RICO claim was time barred.[10] (ECF No. 59.)[11]  On April 28, 2016, the Second Circuit vacated that decision and remanded the action.  See Goel v. Bunge, Ltd., 820 F.3d 554 (2d Cir. 2016).  In pertinent part, the Second Circuit determined that this Court improperly reviewed materials outside of the four corners of the complaint.  Id. at 558-60.  The Second Circuit noted that while this Court had stated that it was able to take judicial notice of certain materials, and that other materials were integral to the complaint, these determinations were in error.  Id.  The Second Circuit also noted that review of such materials required conversion of the motion to dismiss to a motion for summary judgment.  Id.

The mandate issued on May 20, 2016.  Thereafter, defendants informed the Court that they would like the opportunity to move for summary judgment.  The Court allowed such motions.

---

[10] As previously noted, this action was initial brought in state court and was then removed in 2014.

[11] The Court issued a Corrected Opinion & Order on August 26, 2015, remanding plaintiffs' state law claims to the New York Supreme Court, Westchester County.  (ECF No. 63.)

In connection with the current motions for summary judgment—one from Bunge Ltd., Bunge S.A., and GRIPT, and one from SBI—the Court has before it a number of submissions from both sides.  All parties have received notice of the fact that the motion is made pursuant to Rule 56 and have had an opportunity to be heard.

For the reasons set forth below, the two pending motions for summary judgment are GRANTED.  Plaintiffs' RICO claim is barred by the applicable statute of limitations.  In addition, defendant SBI is entitled to sovereign immunity as a foreign state under the Foreign Sovereign Immunities Act.   The Court declines to exercise supplemental jurisdiction over plaintiffs' state-law claims and remands such claims to the Supreme Court, Westchester County.

III.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial.  Id. at 322-23.

In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604

17

F.3d 732, 740 (2d Cir. 2010).  Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations omitted).  In addition, "[o]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment."  Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (internal quotation marks and citation omitted).

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it."  Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing

party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

IV.    DISCUSSION

A.    Plaintiffs' RICO Claim

In its decision, the Second Circuit agreed with this Court that the statute of limitations with regard to plaintiffs' RICO claim is governed by federal law and is therefore not subject to New York's savings statute.  Goel, 820 F.3d at 558.  "RICO claims are subject to a four-year statute of limitations."  Koch v. Christie's Int'l PLC, 699 F.3d 141, 148 (2d Cir. 2012).  Here, the undisputed facts in the record indicate that more than four years passed between the time that plaintiffs were injured and had notice of their potential claim and this lawsuit.  Accordingly, plaintiffs' RICO claim is barred by the statute of limitations.

1.    Plaintiffs' Injury

In RICO cases, the Court applies the "discovery accrual rule, under which the limitations period begins to run 'when the plaintiff discovers or should have discovered the RICO injury.'"  Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 (2d Cir. 2013) (quoting In re Merrill Lynch Ltd. Partnerships Litig., 154 F.3d 56, 58 (2d Cir. 1998)).  "In other words, 'the limitations period does not begin to run until [the plaintiff has] actual or inquiry notice of the injury.'"  (Id.) (alteration in original).  Accordingly, "the first step in the statute of limitations analysis is to determine when the plaintiff sustained the alleged injury for which the plaintiff seeks redress."  Koch, 699 F.3d at 150.

In this case, plaintiffs' alleged RICO injuries occurred not later than 2007. Based on plaintiffs' complaint, the injurious conduct alleged is twofold: First, plaintiffs allege that they were injured on November 29, 2006, when Ramachandran and Teledata India fraudulently induced plaintiff Goel to enter into a Stock Purchase Agreement and sell 51% of his ownership interest in eSys to Teledata India.[12]  Second, plaintiffs allege that they were injured in February 2007 when Teledata India fraudulently induced Rainforest into lending Teledata India $55 million—a loan that was never repaid—under the false pretense that Teledata India needed the funds for business expenses.  (See Compl. ¶¶ 144, 206(a), 208.)

In opposition to the instant motions, plaintiffs now allege that "the precise timing of [their injury] creates an issue of fact, although it occurred well after the Agreement was entered into."  (Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Mem. in Opp."), ECF No. 82, at 40.)  The Court disagrees.

Plaintiffs rely on Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1106 (2d Cir. 1988), First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 767 (2d Cir. 1994), and Cruden v. Bank of New York, 957 F.2d 961, 977-78 (2d Cir.1992), for the

---

[12] For example, plaintiffs state:

Based on the sham contract sales contracts with Bunge and the phony sales to Teledata Marine and Teledata Services, Teledata India represented to various parties, including banks and [plaintiffs] that it had over $238 million in annual revenue, when in fact it had virtually none. Plaintiffs relied on this misrepresentation in agreeing to sell half of eSys to Teledata India and foregoing the opportunity to do the transaction that had been proposed by Credit Suisse, among any other opportunities. . . . The transaction which [p]laintiffs were induced to enter into with Teledata India, for which [p]laintiffs were never paid, caused damage to [p]laintiffs . . . .

(Compl. ¶ 206.)

proposition that a RICO injury does not become ripe until "damages are definite and ascertainable."  (Mem. in Opp. at 40-41.)  Plaintiffs then argue that their "injury was not fully realized until [] eSys' revenue began to diminish, which destroyed it as a company, and finally, when SBI forced [p]laintiffs through foreclosure proceedings that ended in 2011, at which time SBI wrested from Goel the company he had on his own developed, and displaced him as the owner of the shares, and Goel's ownership was lost."  (Id. at 41)  The Court finds, however, that Bankers Trust, Cruden, and First Nationwide are inapplicable.

Rather, this case is analogous to In re Merrill Lynch Ltd. Partnerships Litigation, 154 F.3d 56, 59 (2d Cir. 1998).  In this case, as in In re Merrill Lynch, defendants conduct was allegedly fraudulent at the outset because "[it] could never achieve the promised objectives."  In re Merrill Lynch, 154 F.3d at 59; see CSI Inv. Partners II, L.P. v. Cendant Corp., 180 F. Supp. 2d 444, 458 (S.D.N.Y. 2001) (holding that where the complaint alleged that defendants' fraud induced plaintiffs to enter into a purchase agreement on terms plaintiffs would not have accepted had they known the undisclosed facts, the injury occurred when plaintiffs entered into the purchase agreement on those terms).  That is, according to the allegations in plaintiffs' complaint, defendants defrauded plaintiffs from the moment that Goel entered into the Agreement and Rainforest lent Teledata India the initial $55 million; defendants actions with regards to Goel, eSys, and Rainforest were alleged to be illegitimate from the start.  Goel and Rainforest were injured when the

Agreement was consummated in November 2006 and defendants drained Rainforest's capital in February 2007.

Alternatively, plaintiffs argue that they were defrauded again and suffered separate injuries sometime after 2007. (See Mem. in Opp. at 42-42 & n.8.) Under the separate accrual rule, "a new claim accrues, triggering a new four-year limitations period, each time plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." Bingham v. Zolt, 66 F.3d 553, 559 (2d Cir. 1995). However, "a continuing series of fraudulent transactions undertaken within a common scheme can produce multiple injuries" so the injury must be "new and independent to be actionable." In re Merrill Lynch, 154 F.3d at 59 (holding that the collection of subsequent fees was simply a consequence of the original fraudulent investment rather than an independent injury); World Wrestling Entm't, Inc. v. Jakks Pac., Inc., 530 F. Supp. 2d 486, 527 (S.D.N.Y. 2007), aff'd, 328 F. App'x 695 (2d Cir. 2009) (refusing to extend the statute of limitations for plaintiff's continued below-market royalties because they were merely "subsequent costs associated with the initial injury"). Similar to Merrill Lynch and World Wrestling, any later "injuries" suffered by plaintiffs (e.g., the 2011 foreclosure of eSys shares) were not "new and independent."[13]

---

[13] For example, the foreclosure was not a new and independent injury because SBI merely sought to enforce its security interest in the eSys shares that were pledged to them in 2006 when it gave Teledata India an $80 million loan to finance the bulk of its acquisition. The other actions taken by defendants (and cited by plaintiffs) were part of the same alleged scheme identified above.

2.      Actual or Inquiry Notice of the Injury

As noted above, the Second Circuit has adopted a "discovery accrual rule,

under which the limitations period begins to run 'when the plaintiff discovers or

should have discovered the RICO injury.'"  Cohen, 711 F.3d at 361 (2d Cir. 2013)

(quoting In re Merrill Lynch, 154 F.3d at 58).  Thus, having determined that

plaintiffs' were injured by 2007, the Court must further determine when plaintiffs

had actual or inquiry notice of their injuries.[14]

In Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005), the

Second Circuit set out a detailed description of when inquiry notice occurs:

> Inquiry notice–often called 'storm warnings' in the securities context–
> gives rise to a duty of inquiry "when the circumstances would suggest to an
> investor of ordinary intelligence the probability that she has been
> defrauded." In such circumstances, the imputation of knowledge will be
> timed in one of two ways: (i) '[i]f the investor makes no inquiry once the
> duty arises, knowledge will be imputed as of the date the duty arose"; and
> (ii) if some inquiry is made, "we will impute knowledge of what an investor
> in the exercise of reasonable diligence[ ] should have discovered concerning
> the fraud, and in such cases the limitations period begins to run from the
> date such inquiry should have revealed the fraud."

Id. at 168 (citations omitted).  The Second Circuit has further noted that "[w]hile

inquiry notice as described in Lentell was developed in the context of securities

fraud cases, it applies equally in RICO cases."  Koch, 699 F.3d at 151.

This Court determines that plaintiffs had actual notice of their injuries by

2007.  Several undisputed facts support this conclusion.  First, Goel's own

---

[14] "The Second Circuit has held . . . that 'the question of inquiry notice need not be left to a finder of fact.' In a RICO case, the Court may determine as a matter of law whether sufficient storm warnings existed such that a reasonable investor would suspect fraud." Rosenshein v. Kushner, No. 15-CV-7397, 2016 WL 4508756, at *6 (S.D.N.Y. Aug. 26, 2016) (quoting In re Merrill Lynch, 154 F.3d at 60) (other citations omitted).

deposition testimony from the New York State action,[15] dated January 13, 2012, makes it clear that plaintiffs were well aware of defendants' alleged fraud as early as 2007.  In that deposition, Goel testified that in 2007 he had a meeting with a Teledata India Managing Director, Mr. Padmanabhan, wherein Padmanabhan told Goel that "there were no real sales, there was no real product, it was all fluff, a story" and that the Bunge Defendants were "participating in a knowingly intentional false contract."  (Jan. 13, 2012 Tr. at 465:18-467:25, attached as Ex. 2 to the Declaration of Brian Rosner in Support of Motion to Dismiss the Complaint ("Rosner Decl."), ECF No. 23-2.)

Second, Goel subsequently confirmed having learned in 2007, during his travels to Teledata India's various locations,[16] "that Teledata had no business, no product, [and] no dealings of real products with Bunge."  (Id. at 468:01-469:07.)  Goel testified that he declined an offer to become Teledata India's CEO because he realized that Teledata "was absolutely a sham, zero, not even like 10 or 20 percent real."  (Id. at 471:22-472:07.)  Moreover, Goel testified that Teledata India representatives continued telling him details of the scheme involving the Bunge Defendants because they could no longer "roll over more transactions" and they wanted Goel's help to find another company that could "replace the Bunge kind of false, fraudulent transactions."  (Id. at 469:08-470:5.)

---

[15] The Court considers this a party admission.

[16] These travels were part of a "round-the-world trip" that Goel took in response to Teledata India's offer that he become Teledata India's CEO.  (Jan. 13, 2012 Tr. at 468:02-25.)

As previously noted, plaintiffs also brought arbitration proceedings against Teledata India—but not the defendants in this action—in Singapore in 2009 for its alleged breach of the Agreement.  In those arbitration proceedings, Goel again made clear that he knew of the role that defendants played in the allegedly fraudulent scheme.  In an affidavit filed in the Singapore proceedings, dated April, 27, 2011, Goel declared that Padmanabhan told him in early 2007 that Teledata India had bribed various officers of SBI India to obtain the $80 million loan.  (Goel Aff. ¶¶ 126-28, ECF No. 24-6.)[17]  Additionally, Goel stated that, around May 2007, Ramachandran and Padmanabhan explained the scheme to him in detail, telling him that there was an arrangement between Teledata India, Bunge Ltd. and Bunge S.A., and SBI India, whereby Bunge Ltd. and Bunge S.A. would enter into fictitious contracts with Teledata India, and for which SBI would issue guarantees.  (Id. at ¶¶ 62-67.

---

[17] Goel's April 27, 2011, affidavit is attached as Exhibit 6-1 to the affidavit of Pradeep Pillai (ECF No. 24) submitted in support of SBI's motion to dismiss.

25

These undisputed facts[18] lead to only one conclusion: plaintiffs had actual knowledge (or, at least, inquiry notice)[19] of the alleged fraudulent racketeering scheme and the respective roles of the defendants by the end of 2007 at the latest.[20]

### 3.   Duty of Inquiry

Having determined that plaintiffs had actual notice of their injuries, the four-year statute of limitations began to run by the end of 2007.  Alternatively, even if plaintiffs only had inquiry notice—and thus a duty of inquiry—as of late-2007, their claims are still barred by the statute of limitations.

The Court begins by analyzing whether plaintiffs made an inquiry once the duty of inquiry arose.  If plaintiffs made "no inquiry once the duty [arose], knowledge will be imputed as of the date the duty arose," and if plaintiffs made

---

[18] In opposition to defendants' motions, plaintiffs attempt to discredit their prior testimony by conclusory allegations made via affidavit.  The Second Circuit has made clear, however, that "[c]onclusory allegations cannot create a genuine issue of fact, nor may a party 'create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.'"  Clayborne v. OCE Bus. Servs., 381 F. App'x 32, 34 (2d Cir. 2010) (quoting Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) (other citation omitted).

[19] Given plaintiffs knowledge of Teledata India's alleged misrepresentations, lack of revenue, history of fraudulent activity, as well as the transfer of funds out of Rainforest, a person of ordinary intelligence would have been on inquiry notice by late-2007 that the defendants had likely defrauded plaintiffs and that the transfers of funds from Rainforest were not truly being paid to suppliers.

[20] Plaintiffs argue that even if the above-cited facts are sufficient to illustrate that plaintiffs were on notice by late-2007 with regards to defendants Bunge Ltd., Bunge S.A, Teledata India, and SBI, plaintiffs had no notice of defendant GRIPT's involvement until plaintiffs received discovery in the New York State Court action in 2012.  (Mem. in Opp. at 29-30.)  Accordingly, plaintiffs argue that the four-year statute of limitations period began to run for GRIPT from that date.  (Id.)  They cite JSC Foreign Econ. Ass'n Technostroyexport v. Weiss, No. 06 Civ. 6095 (JGK), 2007 WL 1159637, at *5 (S.D.N.Y. Apr. 17, 2007), for the proposition that "the statute of limitations is triggered only as to those defendants about whom the plaintiffs were on notice."  This case is inapposite as GRIPT is not an independent defendant; its position is entirely dependent on that of its principal, Bunge Ltd.  Plaintiffs have not alleged that they suffered any independent injury traceable to GRIPT.  Given the relationship of the Bunge Defendants and the economic reality of plaintiffs claim, as alleged, GRIPS' status as a subsidiary does not toll the statute of limitations in this case.

some inquiry, the Court "will impute knowledge of what [a plaintiff] in the exercise of reasonable diligence[ ] should have discovered concerning the fraud, and . . . the limitations period begins to run from the date such inquiry should have revealed the fraud." Lentell, 396 F.3d at 168 (internal quotation marks omitted).

Plaintiffs argue that they conducted a "reasonably diligent investigation" from 2009 onwards and only discovered admissible evidence of their injuries in 2012 during the New York State action.  The Court disagrees.

Even accepting that plaintiffs made some inquiry, plaintiffs RICO claims are untimely.  Plaintiffs waited two years from the time when they received inquiry notice in 2007 to contact the Bunge Defendants regarding the nature of the transactions at issue (i.e. plaintiffs waited until late-2009).  (See Compl. ¶ 191.) Plaintiffs then waited nearly three additional years to file suit and initiate the discovery process in the New York State action.  This does not constitute a reasonably diligent investigation such that the four-year statute of limitations should be extended, as plaintiffs seek. See Koch, 699 F.3d at 153 (holding no reasonably diligent investigation where defendant did not begin to inquire for over four years).  Given the facts detailed above, reasonable diligence would have disclosed by 2007 (or 2009 at the latest) plaintiffs' injuries—it would have been known that defendants fraudulently induced Goel to enter into the Agreement and that defendants were fraudulently draining Rainforest's funds.  Accordingly,

knowledge of the injury is properly imputed as of the date the duty to inquire arose in late-2007, or alternatively, 2009 at the latest.[21]

B.  SBI's Sovereign Immunity under the FSIA

In its motion for summary judgment, the State Bank of India argues that it is entitled to sovereign immunity.  As discussed below, the Court agrees.

The Foreign Sovereign Immunities Act ("FSIA") "provides the sole basis for obtaining jurisdiction over a foreign state in federal court."  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989).  The Act defines the term "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state," and further specifies that an "agency or instrumentality of a foreign state" includes, inter alia, "an organ of a foreign state or political subdivision thereof."  28 U.S.C. §§ 1603(a), (b).

Under the Act, a foreign state is "presumptively immune from the jurisdiction of United States courts."  Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993).  "Subject matter jurisdiction exists under the FSIA only if a specified exception to that Act applies."  Chettri v. Nepal Rastra Bank, 834 F.3d 50, 55 (2d Cir. 2016) (citing Nelson, 507 U.S. at 355).  "A defendant seeking dismissal for lack of subject

---

[21] Plaintiffs assert that they are entitled to equitable tolling of the statute of limitations on the basis of defendants' alleged fraudulent concealment. "Under federal common law, a statute of limitations may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's 'discovery of the nature of the claim within the limitations period'; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." Koch, 699 F.3d at 156 (quoting Corcoran v. N.Y. Power Auth., 202 F.3d 530, 543 (2d Cir. 1999)). Here, plaintiffs cannot take advantage of the equitable tolling provision because they knew the nature of their claim within the statutory period and, as discussed above, they did not exercise reasonable diligence to uncover the alleged fraud. See Corcoran, 202 F.3d at 543.

matter jurisdiction under the FSIA bears the burden of presenting a <u>prima facie</u> case that it is a foreign sovereign.  If the defendant meets this burden, the plaintiff must then demonstrate that the foreign sovereign lacks immunity due to an FSIA exception."  <u>Id.</u> (citations omitted).

As an initial matter, plaintiffs allege that SBI is a private commercial bank and is not a foreign state under the FSIA.  (Mem. in Opp. at 49-50.)  This argument is foreclosed by the uncontested record evidence.  In support of its motion for summary judgment, SBI has proffered evidence that SBI was created by the Indian Government by an act of Parliament to provide a state-controlled and state-sponsored organ for a banking system.  (Declaration of Hadrian Tucker ("Tucker Decl." ¶ 3, ECF No. 22.)[22]  Since its inception, a majority stake in SBI has been owned and controlled directly by the Indian Government.  (<u>Id.</u> ¶ 4.)  The Indian Government also appoints a majority of directors to the SBI board.  (Id.)  Plaintiffs have not proffered any contrary evidence.  As a result, there is no triable issue on the question of whether SBI is a foreign state under the FSIA.  <u>See</u> <u>Filler v. Hanvit Bank</u>, 378 F.3d 213, 217 (2d Cir. 2004).  As a foreign state, SBI is presumptively immune from suit under the FSIA.  <u>See</u> <u>Nelson</u>, 507 U.S. at 355.[23]

More complicated is plaintiffs' subsequent argument—that SBI lacks sovereign immunity because the "commercial activity exception" applies in this

---

[22] Tucker is the "Senior Compliance Officer for State Bank of India, United States Operations." (Tucker Del. ¶ 1.)

[23] SBI's eligibility for immunity as a foreign state has been recognized in this Circuit.  <u>See, e.g.</u>, <u>Gosain v. State Bank of India</u>, 414 Fed. App'x. 311, 313-14 (2d Cir. 2011).

case.  Under the commercial activity exception set forth in Section 1605(a)(2) of the

FSIA, a foreign state lacks immunity under the FSIA when:

> the action is based [1] upon a commercial activity carried on in the United
> States by the foreign state; or [2] upon an act performed in the United
> States in connection with a commercial activity of the foreign state
> elsewhere; or [3] upon an act outside the territory of the United States in
> connection with a commercial activity of the foreign state elsewhere and
> that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2); see Chettri, 834 F.3d at 55-56.  "As is plain from the

language of the section, each of its three clauses describes different categories of

conduct for which the foreign state is denied immunity."  Guirlando v. T.C. Ziraat

Bankasi A.S., 602 F.3d 69, 74 (2d Cir. 2010).  Plaintiffs rely solely upon the first and

third clauses.  (See Mem. in Opp. at 51-53.)  As the Court explains below, SBI is

entitled to immunity because neither of these grounds for invoking the commercial

activity exception applies here.

    1.    <u>Clause One: Commercial Activity in the United States</u>

With respect to the first clause, this action is not "based upon a commercial

activity carried on in the United States" by SBI.  "The 'threshold step' in assessing

the applicability of the commercial activity exception is always to 'identify the act of

the foreign sovereign State that serves as the basis for plaintiffs' claims.'"  Chettri,

834 F.3d at 56 (quoting Garb v. Republic of Poland, 440 F.3d 579, 586 (2d Cir.

2006)).  As the relevant commercial activity, plaintiffs allege that "SBI wire-

transferred tens of millions of dollars belonging to Plaintiffs from a Teledata India

account to the New York accounts of defendants ADU and IMU, pursuant to

fraudulent invoices for non-existing imports and services."  (Mem. in Opp. at 51.)
This action, however, is not "based upon" those wire-transfers.

The term "'based upon' . . . calls for something more than a mere connection
with, or relation to, commercial activity."  Nelson, 507 U.S. at 358.  The Supreme
Court recently made "clear that in assessing whether an action is 'based upon' acts
outside the United States, for FSIA purposes, we look not to the analysis of each
individual claim, but to the overall question where a lawsuit's foundation is
geographically based.  Atlantica Holdings v. Sovereign Wealth Fund Samruk-
Kazyna JSC, 813 F.3d 98, 108 (2d Cir. 2016), cert. denied sub nom. Sovereign
Wealth Fund Samruk-Kazyna JSC v. Atl. Holdings, Inc., 137 S. Ct. 493 (2016)
(citing OBB Personenverkehr AG v. Sachs, 136 S. Ct. 390, 396 (2015)).
Furthermore, as the Second Circuit recently reiterated, "[i]n order for a cause of
action to be 'based upon' a commercial activity and thereby fit within the FSI
exception, there must exist a 'degree of closeness . . . between the commercial
activity and the gravamen of the plaintiff's complaint.'"  Chettri, 834 F.3d at 56
(quoting Kensington Int'l Ltd. V. Itoua, 505 F.3d 147, 156 (2d Cir. 2007)); see also
Reiss v. Société Centrale du Groupe des Assurances Nationales, 235 F.3d 738, 747
(2d Cir. 2000) (noting that to sustain jurisdiction on this basis, there must be "a
significant nexus . . . between the commercial activity in this country upon which
the exception is based and a plaintiff's cause of action").

The gravamen of plaintiff's complaint is that, on November 29, 2006,
Ramachandran and Teledata India fraudulently induced plaintiff Goel to enter into

a Stock Purchase Agreement and sell 51% of his ownership interest in eSys to Teledata India.  As previously noted, plaintiffs further allege that they were injured in February 2007 when Teledata India fraudulently induced Rainforest into lending Teledata India $55 million—a loan that was never repaid—under the false pretense that Teledata India needed the funds to pay business expenses.  The wire-transfers made by SBI—i.e. the relevant "commercial activity" according to plaintiffs—are at most related to, but are not the gravamen of, plaintiffs' action.

The Court notes that even if plaintiffs' challenge could be considered "based upon" the wire-transfers made by SBI generally, it cannot be said to be "based upon" wire-transfers or commercial activity "carried on in the United States," as required for the first clause of FSIA Section 1605(a)(2) to apply.  SBI's New York branch ("SBI-NY") "does not have, and never has had, an account relationship with Defendants ADU, IMU, Teledata Marine or Teledata Services."  (Memorandum of Law in Support of Defendant State Bank of India's Motion to Dismiss the Complaint, ECF No. 76, at 26 (citing Tucker Decl. ¶ 6).)  Plaintiffs' allege only that SBI-NY served as a correspondent bank for the transmission of wire transfers from accounts in India to accounts at JPMorgan Chase Bank, N.A. ("Chase") in New York.  (See, e.g., Compl. ¶ 151; Compl. Ex. A.)  Importantly, the statements attached as Exhibit A to plaintiffs' complaint demonstrate that SBI-NY acted as the correspondent bank for only 12 out of an alleged 180 fraudulent wire transfers at issue.  (See ECF No. 12-2 at 10, 66, 78, 84; ECF No. 12-3 at 1.)  Furthermore, these 12 transfers account for only $8,886,106 of the $127,000,000 in allegedly fraudulent

wire transfers (or 7%).  These limited wire-transfers cannot be considered commercial activity upon which plaintiffs' action is based.[24]  See Human Rights in China v. Bank of China, 02-cv-4361, 2005 WL 1278542, at *3 (S.D.N.Y. 2005) (finding the first clause of the commercial activity exception inapplicable where bank made incidental transfers in New York).

2.    Clause Three: Commercial Activity Elsewhere

In the alternative, plaintiffs claim that SBI is not entitled to immunity because the third clause of the commercial activity exception applies—i.e., plaintiffs argue that their action is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act cause[d] a direct effect in the United States."  (Mem. in Opp. at 70.)  The Court disagrees.

For the third clause of the commercial activity exception to apply, "the lawsuit for which jurisdiction is sought must be (1) 'based . . . upon an act outside of the territory of the United States'; (2) 'that was taken in connection with a commercial activity [of the foreign state] outside of this country'; and (3) 'that caused a direct effect in the United States.'"  Virtual Countries, Inc. v. Republic of South Africa, 300

---

[24] In opposition to SBI's motion, plaintiffs cite Rosner v. Bank of China, 528 F. Supp. 2d 419, 423 (S.D.N.Y. 2007) for the proposition that "wire transfers from New York are commercial activity" such that there is no FSIA immunity in a RICO case.  (Mem. in Opp. at 69.)  Although Rosner is similar to this case in some regards, there are key factors that distinguish the instant action.  Here, unlike in Rosner, plaintiffs allege that SBI was a participant in a fraudulent scheme that took place almost entirely outside of the United States.  See Rosner, 528 F. Supp. 2d at 424-25.  Importantly, this is "a case in which a plaintiff is seeking to apply the commercial activity exception because a tangential part of the alleged action took place in the United States."  Id.  This difference is critical, as noted by the Rosner Court.  See id.

F.3d 230, 236 (2d Cir. 2002) (quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992)).

"[A]n effect is direct if it follows as an immediate consequence of the defendant's activity." Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 618 (1992); accord Martin v. Republic of S. Africa, 836 F.2d 91, 95 (2d Cir. 1987) ("The common sense interpretation of a 'direct effect'" within the meaning of § 1605(a)(2) "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption."). The Second Circuit employs a "legally significant acts" requirement, demanding that "the conduct having a direct effect in the United States be legally significant conduct in order for the commercial activity exception to apply." Filetech S.A. v. Fr. Telecom S.A., 157 F.3d 922, 931 (2d Cir. 1998); see also Guirlando v. T.C. Ziraat Bankasi A.S., 602 F.3d 69, 73-79 (2d Cir. 2010).

Assuming for the purpose of this motion that plaintiffs' action is based upon acts taken outside the United States in connection with commercial activity by SBI, plaintiff has still failed to raise a triable issue that the acts had a "direct effect in the United States." First, "the financial losses allegedly suffered by [Rainforest], a foreign corporation that is not present in the United States, do not meet the 'direct effect in the United States' standard." Itoua, 505 F.3d at 158. Additionally, the transfer of funds out of a New York bank account is not itself sufficient to place the effect of a defendant's conduct in the United States within the meaning of the third prong of the commercial activity exception. Guirlando, 602 F.3d at 80; see also Antares Aircraft, L.P. v. Fed. Republic of Nigeria, 999 F.2d 33, 36 (2d Cir. 1993).

34

3.    Waiver of Immunity

Under the FSIA, a foreign state is not immune from suit "in any case . . . in which the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1).  Plaintiffs argue that by virtue of the fact that SBI has agreed to be bound by New York Banking Law, which requires consent to certain jurisdictional issues for suits, it has waived its immunity under the FSIA.  This is incorrect.

An explicit waiver must be "clear and unambiguous."  Capital Ventures Int'l v. Republic of Argentina, 552 F.3d 289, 293 (2d Cir. 2009) (quoting Libra Bank Ltd. v. Banco Nacional de Costa Rica, S.A., 676 F.2d 47, 49 (2d Cir. 1982)).  The purpose of an "explicit" waiver requirement "is to preclude inadvertent, implied, or constructive waiver in cases where the intent of the foreign state is equivocal or ambiguous."  Id.  SBI does not contest that it has agreed to comply with New York Banking Law § 200-b.  That agreement cannot, however, be construed as an explicit waiver of FSIA immunity as a matter of law.  And other than pointing to agreement to comply with New York Banking laws, plaintiffs point to no evidence of an explicit waiver.

The FSAI exception for implied waivers "must be construed narrowly." Cabiri v. Gov't of Republic of Ghana, 165 F.3d 193, 201 (2d Cir. 1999).  An implied waiver may occur when a foreign sovereign has taken an action in relation to specific litigation.  Cf.  Smith ex rel. Smith v. Socialist People's Libyan Arab Jamahiriya, 101 F.3d 239, 244 (2d Cir. 1996) ("Congress primarily expected courts to hold a foreign state to an implied waiver of sovereign immunity by the state's

35

actions in relation to the conduct of litigation."). This Court is not aware of, nor have plaintiffs pointed to any, precedent finding that the type of consent included generically in New York Banking law § 200-b is sufficient to constitute a waiver of federally granted foreign immunity. Indeed, that is because such a position would be incorrect.[25]

C.   Remaining State Law Claims

There is no dispute that, of the claims asserted in the complaint, only the civil RICO claim arises under federal law. A district court "may decline to exercise supplemental jurisdiction over a claim in subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Accordingly, having dismissed plaintiffs' federal claim, the Court declines to exercise supplemental jurisdiction, and remands the state law claims to the New York State Supreme Court, Westchester County, where this case was originally filed. See Valencia ex rel. Franco v. Lee, 316 F.3d 299, 308 (2d Cir. 2003) ("Because this case was commenced in state court, the district court should remand the action to the state court in which it was originally filed.").

---

[25] This has been implicitly acknowledged by various decisions finding numerous sovereign banking institutions doing business in New York nonetheless immune pursuant to the FSIA. See, e.g., Fir Tree Capital Opportunity Master Fund, L.P. v. Anglo Irish Bank Corp., No. 11-Civ-0955, 2011 WL 6187077, at *7-8, 11-22 (S.D.N.Y. Nov. 28, 2011); Guilando v. T.C. Ziraat Bankasi, No. 07-Civ-10266, 2008 WL 5272195, at *3, 5 (Dec. 15, 2008), aff'd, 602 F.3d 69 (2d Cir. 2010); Brenntag International Chemicals, Inc. v. Norddeutsche Landesbank GZ, 9 F. Supp. 2d 331, 333 & n.1 (S.D.N.Y. 1998), aff'd sub nom, 175 F.3d 245 (2d Cir. 1999); ICC Chem. Corp. v. Indus. and Commercial Bank of China, 886 F. Supp. 1 (S.D.N.Y. 1995).

V.       THE BUNGE DEFENDANTS' MOTION FOR SANCTIONS

In addition to moving for summary judgment, the Bunge Defendants have moved for sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. (ECF No. 102.)  The Bunge Defendants' principle argument is that plaintiffs should have withdrawn their RICO claim, which defendants allege became frivolous following the Supreme Court's recent decision in RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090 (2016), regarding the extraterritorial reach of the RICO statute.  This Court finds that Rule 11 sanctions are not warranted here.

RJR Nabisco is not on all fours with the conduct asserted here, and the Court does not find that plaintiffs' continued pursuit of their RICO claim was frivolous. Therefore, the Court does not find a Rule 11 violation.  Furthermore, the decision whether to award sanctions is "committed to the district court's discretion."  Ipcon Collections LLC v. Costco Wholesale Corp., 698 F.3d 58, 63 (2d Cir. 2012).  No sanctions are appropriate here.

Accordingly, the Bunge Defendants' motion for sanctions is DENIED.

VI.      CONCLUSION

As discussed above, this Court finds that plaintiffs' RICO claim is barred by the applicable statute of limitations and that defendant SBI is entitled to sovereign immunity.  Accordingly, defendants' motions for summary judgment are GRANTED.[26]  As also discussed above, the Bunge Defendants' motion for sanctions is DENIED.

---

[26] The Court notes that defendants Ramachandran, ADU, IMU, Teledata Marine, and Teledata Services are not represented by counsel in this action and were not parties to the instant motions for

The Clerk of Court is directed to terminate the motions at ECF Nos. 89 and 102 and to terminate the actions at both 14-cv-1895 and 14-cv-2053.

SO ORDERED.

Dated:      New York, New York
            March 21, 2017

_____
KATHERINE B. FORREST
United States District Judge

---

summary judgment.  While the rationale of this Opinion applies to those defendants, who are effectively included as related to the moving parties, the parties shall submit a letter not later than April 8, 2017, if they believe that this case should not be terminated on account of those defendants' non appearance in this action.